FILED

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

95 AUG 30  A: 9: 19

U.S. DISTRICT COURT
N.D. OF ALABAMA

RAYMOND BELL,                            }
                                         }
        Plaintiff,                       }
                                         }
v.                                       }          **CASE NO. CV 97-B-1919-S**
                                         }
HOSPITAL HOUSEKEEPING                    }
SYSTEMS,                                 }          **ENTERED**
                                         }
        Defendant.                       }          AUG 3 0 1999

## MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment of defendant Hospital

Housekeeping Systems ("HHS").  Plaintiff Raymond Bell brought this action against HHS, his

former employer, alleging that he was discharged on the basis of his race in violation of 42 U.S.C.

§ 2000e et seq. ("Title VII") and 42 U.S.C. § 1981.  Upon consideration of the record, the

submissions of the parties, the argument of counsel, and the relevant law, this court is of the

opinion that defendant's motion is due to be denied.

## I. FACTUAL SUMMARY

In September of 1995, Bell, an African-American, was hired by HHS to work as an

assistant manager in its operations at Carraway Hospital.  (Bell Dep. at 107).  The HHS operation

at Carraway consisted of two housekeeping contracts.  (*Id.* at 59).  Under one of the contracts,

HHS maintained Carraway hospital itself.  (*Id.*).  Under the other, HHS maintained the Norwood

Clinic and various surrounding facilities affiliated with the hospital.  (*Id.* at 59-60).  The

surrounding facilities included an Ortho/Dialysis building, a Trauma Center, a day care center, a

church, the Montgomery Apartments, and the North Birmingham Clinic. (Hollander Dep. at 32).

*36*

In December of 1995, HHS assigned Bell to manage the maintenance of the Norwood Clinic and surrounding facilities. (Bell Dep. at 61-62; Hollander Dep. at 116-123).

When HHS hired Bell, John Hollander was the director of the site and had overall managerial responsibility for both contracts. (Hollander Dep. at 12-13). Bell and other assistant managers reported directly to Hollander, who in turn reported to Jeff Totten, the Eastern Region President. (Bell Dep. at 61; Hollander Dep. at 13). In October of 1995, HHS hired Bruce Remillard ("Remillard") as an assistant manager in Texas, after which he was shortly transferred to Carraway Hospital and assigned to the night shift. (Hollander Dep. at 27-30). In June of 1996, HHS promoted Hollander to Eastern Region Vice-President, leaving the position of director available. (Hollander Dep. at 13, 76-77). Remillard was chosen as Hollander's replacement as director. (*Id*. at 76).

On July 5, 1996, Remillard terminated Bell's employment with HHS for allegedly failing to ensure that coverage was provided on July 4, 1996, for the Ortho/Dialysis building. (Bell Dep. at 189-91). On July 23, 1996, Bell filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging that HHS had subjected him to differential treatment in the conditions of his employment and later discharged him because of his race. (Tab M to Def.'s Evid. Submission, Def.'s Exh. 20). Bell's position at HHS was subsequently filled by a white male. (Totten Dep. at 23).

HHS contends that it fired Bell for poor job performance. (*Id*. at 41-44). Bell's initial supervisor, Hollander, alleges that Bell failed to manage has staff effectively and also failed to follow through and ensure that the buildings under his supervision were being cleaned properly. (Hollander Dep. at 123-139). Hollander claims that he received complaints from administrators at

2

Carraway regarding the cleanliness of the buildings and the failure to effectively address the problems. (*Id.* at 164-73). After numerous oral warnings, Hollander and Remillard allegedly reprimanded Bell in writing on three occasions in May of 1996 for various problems with his job performance. (Tab I to Def.'s Evid. Submission, Def.'s Exh. 7,8,10). On June 13, 1996, Remillard gave the plaintiff a performance evaluation which listed many aspects of his performance which needed improvement, most notably an inability to carry out duties without close supervision and a general lack of knowledge of cleaning techniques and administrative procedures. (Tab F to Def.'s Evid. Submission, Def.'s Exh. 9). Later in June, Remillard again reprimanded Bell in writing for poor job performance. (Tab J to Def.'s Evid. Submission, Def.'s Exh.11). Then, on July 5, 1996, HHS terminated Bell's employment for allegedly failing to ensure that coverage was provided for the Ortho/Dialysis building. (Bell Dep. at 189-91). As evidence that he knew his performance was unsatisfactory, HHS presented an undated letter in which Bell acknowledged his poor job performance and promised to improve. (Tab E to Def.'s Evid. Submission, Def.'s Exh. 19).

Bell claims that HHS gave a false reason for terminating his employment. (Bell Aff. ¶ 10). Bell states that he personally spoke with HHS employee Debra Wilson to ensure that she would cover the Ortho/Dialysis building on July 4th. (Bell Aff. ¶ 9). Bell contends that he offered to personally come in on July 4th, but Remillard instructed him not to do so. (Bell Aff. ¶ 11). As evidence that Wilson actually came in and cleaned, Bell points to the sign-in sheet for July 4th which contains Wilson's signature. (Tab L to Def.'s Evid. Submission, Def.'s Exh. 16). Bell further claims that the disciplinary reports cited by the plaintiff are "phony" and the incidents in those reports are fabricated or exaggerated. (Bell Aff. ¶¶ 13-16). Plaintiff offers the fact that he

3

never signed any of the documents as evidence that the reports were fabricated. (Tabs I, J, and K to Def.'s Evid. Submission, Def.'s Exh. 7,8,10,11,14).

Bell asserts that Remillard made remarks to him which indicated a racial bias. (Bell Aff., ¶ 18). Bell alleges that Remillard repeatedly made offensive statements about the cars he drove and the clothes he wore. (Bell Dep. at 230-32, 237-38, 253-54). Bell considered these comments to be based on racial stereotypes. (*Id.*). For instance, Remillard allegedly told plaintiff that just because he drove expensive automobiles and dressed well, "you are no better than anyone else" and that nobody would do him any favors. (*Id.* at 231). Once when Remillard turned down Bell's request for use of certain equipment and supplies, Bell contends that Remillard stated "I'm not doing this because you are black," followed by an affectation of laughter. (Bell Aff. ¶ 18). Bell asserts that Remillard made the same comment to him after he was given a performance evaluation critical of his work by Remillard. (*Id.*).

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

4

477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

A plaintiff alleging illegal discrimination under Title VII[1] may establish a genuine dispute as to his claim in three ways:  1)  by presenting direct evidence of discriminatory intent, *see Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998) (direct evidence defined as "evidence, which if believed, proves existence of fact in issue without inference or presumption");  2)  by meeting the three-step test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or 3) by demonstrating through statistics a pattern of discrimination,[2] *see Carter,* 132 F.3d at 642 n.5 (citing *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984)).

---

[1]Where a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under Section 1981, the legal elements of the claims are the same and thus the claims need not be discussed separately. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985).

[2]Bell has presented no statistical evidence to support his claim that defendant discriminated against him on the basis of race.

Direct evidence of discrimination is "evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir.). If the employee produces direct evidence of discrimination, the employer must prove that the same employment decision would have been made absent any discriminatory intent. *Id.* For a derogatory statement or slur to constitute direct evidence, the remark or slur must be attributable to the decision-maker at issue. *See Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir. 1987) (holding that statements made by a non-decision-maker were too attenuated to present a genuine issue of material fact as to the employer's discriminatory intent); *see also LaMontagne v. American Convenience Products*, 750 F.2d 1405, 1412 (7th Cir. 1984) (age-related comments allegedly made by employer's Vice-President not relevant to question of whether plaintiff's discharge was discriminatory as Vice-President had no authority to discharge plaintiff). The Eleventh Circuit has also recognized that "statements by decision-makers unrelated to the decisional process itself" do not constitute direct evidence "requiring the employer to prove that its hiring or professional decisions were based on legitimate criteria."[3] *Equal Employment Opportunity Comm'n v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990) (citing *Price*

---

[3] "Direct evidence is '[e]vidence which if believed, proves existence of fact in issue *without inference or presumption.*'" *Rollins v. Techsouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Although it may seem reasonable to infer that a person who makes a discriminatory remark outside of the decisional process will conduct business in a discriminatory manner, such a conclusion requires an inference. Therefore, comments made completely outside of the decisional process do not constitute direct evidence that the speaker discriminated in making the employment decision at issue. *Compare Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 930-31 (11th Cir. 1995) (holding that employer's statement that women were not tough enough to do the job constituted direct evidence of sex discrimination) *with Equal Employment Opportunity Comm'n v. Alton Packaging Corp.*, 901 F.2d 920, 923-24 (11th Cir. 1990) (holding that decisionmaker's statement to black employee that "you people can't do a --------- thing right" did not constitute direct evidence of discrimination).

*Waterhouse v. Hopkins*, 490 U.S. 228, 276 (1989) (O'Connor, J., concurring)); *see also Alphin v. Sears Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991).

Bell has not produced direct evidence of discrimination. Because Remillard's alleged comments about Bell's car and clothes were not related to the decisional process itself, they do not constitute direct evidence of discrimination. Remillard's two comments to Bell in which he allegedly said that he was "not doing this because you are black," followed by an affectation of laughter, are not direct evidence of discrimination because the "statements could by inference have more than one meaning," and thus merely provide an inference of discrimination. *Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996).

Because plaintiff presents no direct or statistical evidence of discrimination, he must rely on the *McDonnell Douglas* burden shifting analysis. Under the *McDonnell Douglas* framework, the plaintiff first "must establish a prima facie case of discrimination. The employer then must respond with a legitimate, nondiscriminatory reason for its actions. In order to prevail, the plaintiff must establish that the employer's articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination." *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998), (citing *Walker v. NationsBank of Fla. N.A.* 53 F.3d 1548, 1556 (11th Cir. 1995)). Despite the burden shifts in the *McDonnell Douglas* test, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997).

In order to establish a *prima facie* case of discriminatory discharge on the basis of race, Bell must prove: 1) he was a member of a protected class; 2) he was qualified for the job; 3) he

7

was terminated despite his qualifications; and 4) his former position remained open after his termination and the employer continued to seek similarly qualified applicants. *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 964 (11th Cir. 1997). Bell is an African-American. He was qualified for his job and was terminated despite his qualifications. His former position remained open and was subsequently filled by a white male. Thus, Bell has established a prima facie case of discriminatory discharge.

HHS has asserted a legitimate non-discriminatory reason for his discharge. Defendant states that Bell was terminated because of poor job performance. HHS contends that it gave Bell several warnings and reprimands concerning his poor work performance but, since his work did not improve, it was forced to fire the plaintiff.

In order to survive summary judgment, Bell must produce such evidence that a reasonable jury may find that defendant's stated reasons were pretext and that the employment decision was in fact motivated by race. Bell contends that HHS fabricated a reason to fire him. He alleges that all of the disciplinary reports are "phony" and the incidents contained in them were either fabricated or exaggerated. As to the charge that he failed to provide coverage for the Ortho/Dialysis Building, Bell argues that Wilson did clean the Ortho/Dialysis building on July 4th, as was evidenced by her signature on the sign in sheet.

As further evidence of pretext, Bell cites comments supposedly made by the very person who terminated his employment, Remillard, which allegedly demonstrate his racial bias. Bell contends that Remillard made the comment "I'm not doing this because you are black," followed by an affectation of laughter after he denied the plaintiff's request for equipment and supplies. Remillard also allegedly made the same comment when he gave plaintiff an unfavorable

8

evaluation. Bell also states that Remillard repeatedly made remarks about his car and his clothes such as "you are no better than anyone else" and that nobody will do you any favors.

Defendant contends that the records and disciplinary reports indicate that Bell displayed poor job performance throughout his tenure at HHS. It is also alleged that Bell's failure to ensure coverage for the Ortho/Dialysis building on July 4, 1996, was the last in a series of events which led to his dismissal. Defendant also flatly denies that any records or reports were fabricated and points to the letter that Bell gave to Hollander, in which he acknowledged his poor job performance, as evidence that Bell was aware that his work was unsatisfactory. HHS argues that the alleged statements made by Remillard to Bell are too ambiguous under the circumstances to establish racial discrimination.

In *Ross v. Rhodes Furniture*, 146 F.3d 1286 (11th Cir. 1998), the plaintiff, an African-American, was fired from his position of delivery manager for soliciting tips. Plaintiff was fired for making a tip jar and placing it outside the loading dock, even though one of his superiors had previously taken tips without being terminated. One of the supervisors involved in his discharge previously had pointed to the plaintiff and told another non-minority employee, "[y]ou see that one over there, I am going to get rid of him." *Id.* at 1291. Plaintiff argued that "that one over there" evinced racial animosity by the supervisor. The other person involved in the decision made a comment many years previous to the termination of the plaintiff that "I never seen as many blacks in this building except in a Tarzan movie." *Id.* Even though one of the comments did not directly refer to the plaintiff's race and the "Tarzan" comment was made years before the decision to terminate the plaintiff, the Eleventh Circuit reversed the trial court's grant of a JNOV in favor of the defendant and held that "these comments, considered together with the fact that Kirkland

9

had received tips, support the jury's rejecting Rhodes's proffered explanation for firing Ross." *Id.*
at 1292.

In this instance, the comments made by Remillard could reasonably be construed as
evincing racial animus. Furthermore, the signature of the employee who was supposed to cover
the Ortho/Dialysis building on the sign-in sheet suggests that she might have cleaned the building.
In addition, the plaintiff did not sign any of the disciplinary reports, nor was it noted that he
refused to sign them. This indicates that he may not have seen them. Plaintiff has presented
sufficient evidence that a reasonable jury could disbelieve HHS's proffered explanation for its
action and instead find that it was a pretext for discrimination based on the plaintiff's race.
Therefore, the court finds that HHS has not met its burden of showing that no genuine issues of
material fact exists.

## III.   CONCLUSION

The court concludes that defendant's Motion for Summary Judgment is due to be denied.
An Order in accordance with this Memorandum Opinion will be entered contemporaneously
herewith.

**DONE** this $\underline{3\text{th}}$ day of August, 1999.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

10